IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROBERT SANDERS,                           :

     Plaintiff,                         :

vs.                                            CA 05-0383-C

                                    :

JO ANNE B. BARNHART,
Commissioner of Social Security,  :

     Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. 636(c), for all proceedings in this Court. (*See* Doc. 14 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case . . . and order the entry of a final judgment, and conduct all post-judgment proceedings.")) Upon consideration of the administrative record, plaintiff's proposed report and recommendation, the Commissioner's proposed report and recommendation, and the oral arguments

of the parties on January 11, 2006,  it is determined that the Commissioner's

decision denying plaintiff benefits should be affirmed.[1]

Plaintiff alleges disability due to lumbar spondylosis, diabetes, and a

heart condition.  The Administrative Law Judge (ALJ) made the following

relevant findings:

> 1.      The claimant's insured status for disability insurance
> benefits expired at the close of December 31, 2001 (Exhibit B-
> 4D). Therefore, disability must be established on or before the
> date last insured.
>
> 2.      The claimant alleged a disability onset date of May 5,
> 1998, one day after the prior unfavorable decision of the
> Administrative Law Judge. Thus, the period under adjudication
> has extended from May 5, 1998 through December 31, 2001.
>
> 3.      There is no evidence to show that the claimant engaged
> in substantial gainful activity during the period under
> adjudication.
>
> 4.      The claimant had the following "severe" medically
> determinable impairments on or before [the] date last insured:
> bulging discs versus disc herniation of the low back; status post
> rotator cuff repair; reduced intellectual functioning due to an 80
> IQ score with an overall rating of low average intelligence; and
> somatization disorder.
>
> 5.      The claimant alleged diabetes, blurred vision and a heart

---

[1]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc.  14 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

condition as a "severe" impairments, but the same were not established as entailing significant work-related limitations of record for a continuous period of twelve months on or before [the] date last insured.

6.    No single medically determinable impairment, or combination thereof, had specific or equivalent severity of medical findings necessary to establish presumptive disability under the evaluative standards found in Appendix 1 of the Regulations on or before [the] date last insured.

7.    On or before [the] date last insured, the claimant retained the residual functional capacity for at least light and sedentary exertion, in function-by-function terms (SSRs 96-8p and 83-10), that did not involve overhead reaching on a regular basis. The claimant further retained the mental residual functional capacity for at least less stressful, simple unskilled work tasks (SSR 85-15). In this regard, the claimant had no more than a "moderate" limitation in his ability to perform the activities of daily living; experienced no more than "slight" difficulties in his ability to function socially; "seldom" experienced documented limitations in his concentration, persistence, and pace; and did not experience episodes of decompensation during the period of adjudication. This combined physical and mental work capacity was not prohibited or significantly altered by continuous 12-month periods of impairment exacerbation during the period of adjudication, i.e., May 5, 1998 through December 31, 2001, the claimant's date last insured. There were no treating physician opinions on a specific work capacity, rendered of record, deemed contrary to the above-stated residual functional capacity for the period of adjudication.

8.    The claimant's representative asserted that new and material evidence was submitted after the claimant's date last insured, i.e., December 31, 2001, that would adequately establish disability from the claimant's impairments that would relate back to the period of May 5, 1998 through December 31, 2001. However, the claimant did not seek treatment for an

extended period of time after the date last insured, and later diagnostic testing showed some improvement with regard to the lower back. If there were any presumed worsening of the claimant's back condition that justified surgery in February 2003, this was too distant in time to reasonably alter the claimant's residual functional capacity during the period of adjudication.

9.      The claimant's testimony of subjective complaints and functional limitations was not supported by the evidence as a whole in the disabling degree alleged and therefore lacked credibility for the time period on of before the date last insured.

10.     Based on the residual functional capacity stated above, the claimant was presumably unable to perform any category of past relevant work on or before the date last insured.

11.     The claimant was a "younger individual" on or before the date last insured.

12.     The claimant had attained a 10th grade "limited" education on or before the date last insured.

13.     The transferability of past-acquired work skills under the medical/vocational guidelines would be "immaterial" to the outcome of this case for the time period on or before the date last insured.

14.     Considering the claimant's vocational factors and residual functional capacity, vocational Rules 202.18 and 202.19 of the medical/vocational guidelines (Appendix 2) provide a framework for decisionmaking on or before the date last insured. Within that framework, the claimant was able to perform representative occupations existing in significant numbers in the regional and national economies on or before [the] date last insured, as illustrated by the testimony of an impartial vocational expert.

15.     The claimant was <u>not</u> under a disability as defined in the Social Security Act, at any time prior to his date last insured, December 31, 2001.

(Tr. 639-641 (emphasis in original)) The Appeals Council affirmed the ALJ's decision (*see* Tr. 587-590) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## <u>DISCUSSION</u>

In all Social Security cases, the claimant bears the burden of proving that he is unable to perform his previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Once the claimant meets this burden, as here, it becomes the Commissioner's burden to prove that the claimant is capable, given his age, education and work history, of engaging in another kind of substantial gainful employment which exists in the national economy. *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that he can

perform light and sedentary work activity within the framework of the grids, a representative sample of which was identified by the vocational expert, is supported by substantial evidence.  Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).   "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

In this case, the plaintiff contends that the ALJ  committed the following errors: (1) he improperly substituted his opinion for that of the medical expert, Dr. Bendt Peterson; (2) he failed to obtain the testimony of a medical expert; and (3) he erred in finding his diabetes and heart condition to be non-severe impairments. The Court considers plaintiff's allegations of error in reverse order.

A.   **Plaintiff's Diabetes and Heart Condition**.   The ALJ specifically found plaintiff's diabetes and heart condition to be non-severe impairments during the relevant time period, that is, from May 5, 1998 through December 31, 2001. (Tr. 639, Finding No. 5 ("The claimant alleged diabetes,

6

blurred vision and a heart condition as 'severe' impairments, but the same were not established as entailing significant work-related limitations of record for a continuous period of twelve months on or before [the] date last insured."); *see also* Tr. 629 ("The claimant also alleged multiple other impairments as 'severe' conditions during the period of adjudication including a 'heart condition,' 'blurred vision' and 'diabetes.' However, the same were not established as entailing significant work-related limitations of record for a continuous period of twelve months during the period of adjudication. In addition, there was a lack of medical documentation to support an allegation that such impairments were 'severe.'")) It is plaintiff's contention that the ALJ erred in finding these impairments non-severe in light of the low threshold showing necessary in this Circuit to establish a severe impairment. *See McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected.").

Even assuming the ALJ erred in failing to find that plaintiff's diabetes and heart condition were severe during the relevant time period,[2] such error

_____

[2]     The evidence from the relevant time period, that is, May 5, 1998 through December 31, 2001, regarding plaintiff's diabetes reflects nothing other than this condition is controlled by medication provided the claimant is medication-compliant. (*See, e.g.,* Tr. 451, 469 & 482) There is no evidence that any doctor ever indicated that plaintiff's ability to perform the

was harmless since the evidence of record establishes, as referenced by the ALJ, that these conditions would not entail any significant work-related limitations of function not contemplated by the ALJ's residual functional capacity determination.

> **B.    The ALJ's Failure to Obtain the Testimony of a Medical Expert.**  Plaintiff contends that the ALJ should have obtained the opinion of a medical expert pursuant to SSR 96-6p ("When additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments . . . the administrative law judge must call on a medical expert.") in order to assess whether his back impairment was equivalent in severity to a listed impairment and, in addition, should have obtained testimony from a

---

physical and mental requirements of work would be impacted in any manner by his diabetes; therefore, the ALJ's finding that plaintiff's diabetes was a non-severe impairment during the period of adjudication, if error at all, was mere harmless error.

During the relevant time period, specifically in December of 2000, Dr. Raymond Bell, classified plaintiff's heart condition as Functional Class I. (Tr. 481) "Class I of the American Heart Association's heart disease classification system . . . applies to patients 'with cardiac disease but *no* resulting limitation of physical activity.'" *Anderson v. Bowen*, 868 F.2d 921, 926 (7th Cir. 1989) (emphasis in original). The remaining evidence of record from the relevant time period related to plaintiff's heart condition is not contrary to Dr. Bell's classification of Sanders' heart condition. (*See* Tr. 451, 469, 476 & 566-567) Accordingly, the Court again concludes that even if the ALJ erred in failing to find plaintiff's heart condition a severe impairment, such error was harmless.

medical expert pursuant to  SSR 83-20 in order to determine the precise date plaintiff's progressive back impairment became disabling.

The need for the testimony of a medical expert pursuant to SSR 83-20 is, by the very terms of the ruling, limited to those cases in which precise evidence of the date of onset of disability is either not available or is in conflict so that there is a need to infer the onset date of disability. *See* SSR 83-20.

> In determining the date of onset of disability, **the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegations, additional development may be needed to reconcile the discrepancy.** However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.
>
> .     .     .
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. **At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred**. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id.* (emphasis supplied). In this case, there was no occasion to infer the onset

of disability inasmuch as the evidence of record clearly established plaintiff's disability onset date as May 5, 1998. As the onset date of disability was established by the evidence of record, the provisions of SSR 83-20 were not applicable in this case; therefore, the ALJ committed no error in failing to procure the assistance of a medical advisor to infer the onset date of disability.

Social Security Ruling 96-6p covers consideration of administrative findings of fact by state agency medical and psychological consultants, as well as other program physicians and psychologists, at the Administrative Law Judge and Appeals Council levels of administrative review in the area of medical equivalence under the Listing of Impairments. The ruling also "clarifies policy interpretations regarding administrative law judge and Appeals Council responsibility for obtaining opinions of physicians or psychologists designated by the Commissioner of Social Security regarding equivalence to listings in the Listing of Impairments[.]" The ruling provides, in relevant part, as follows:

> When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

--When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, **the administrative law judge must call on a medical expert**.

*Id*. (emphasis supplied).

It is plaintiff's argument that when the ALJ received additional medical evidence from Drs. Edmund Dyas and Bendt Peterson (*see* Tr. 725-729 & 744-753) he was required to call on a medical expert to offer an opinion as to whether plaintiff's back impairment was equivalent in severity to any listed impairment. The problem with this argument, however, is that the evidence supplied by Drs. Dyas and Peterson which plaintiff relies upon came into existence well over a year after Sanders' insured status expired and these two doctors offer no opinion which relates this evidence back to plaintiff's condition as it existed at the time his insured status expired. Accordingly, this Court cannot find that SSR 96-6p has any application in this case.

## C.   The ALJ Improperly Substituted His Opinion for that the

## Medical Experts, Drs. Peterson and Dyas.   Plaintiff's primary argument in

this case is that the ALJ improperly substituted his opinion for that of the

medical expert, Dr. Peterson.[3]   The plaintiff takes issue with the following

analysis performed by the ALJ:

> Before proceeding further, the Administrative Law Judge notes that the claimant's representative has asserted that new and material evidence has been submitted after the claimant's date last insured, i.e., December 31, 2001, in an attempt to establish disability that could relate back to that time period. In support thereof, reference is made to the updated records from Dr. Dyas and the treatment notes from Dr. Peterson.
>
> Admittedly, the claimant underwent a lumbar disectomy in February 2003. However, salient facts from the period, December 31, 2001 until February 4, 2003, exist and show that the claimant's condition in February 2003, cannot be reasonably related back in time to the period of May 5, 1998 through December 2001 to establish that the claimant experienced disability as of or before his date last insured. The Administrative Law Judge notes, for example, that the medical record contains a hiatus of treatment for the low back from December 7, 2001 through October 11, 2002, with the exception that the claimant received prescriptions from the treating physician (Exhibits B-23F and B-25F). Further, Dr. Peterson explained to the claimant that his complaints of pain during the

---

[3]       It is, of course, improper for an ALJ to substitute his hunch or intuition for the diagnosis of a medical professional. *See Marbury v. Sullivan*, 957 F.2d 837, 840-841 (11th Cir. 1992) (Johnson, Senior Circuit Judge, concurring specially) ("An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before him *in his private or personal capacity*; however, as a hearing officer he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional.").

prior **discography** did **not correlate to the correct dermatomes** that would be expected based upon the discogram procedure. That is to say, the results of the discogram did not indicate that surgical intervention was indicated at the levels of the spine where the claimant complained he was experiencing pain. Moreover, a subsequent **MRI** performed in January 2003, indicated that the claimant's condition about the lower back had somewhat improved. For example, there was only **mild** disc protrusion at L4-5 and L5-S1 that was accompanied by some desiccation. Nevertheless, the claimant's physician offered surgery, which the claimant accepted. Thus, to reiterate, the claimant did not seek treatment for an extended period of time after the date last insured, and later diagnostic testing showed some improvement with regard to the lower back. The undersigned concludes that, even if some worsening of the claimant's back condition could be presumed that would have justified surgery in February 2003, this was too distant in time to reasonably alter the claimant's residual functional capacity for the period of May 5, 1998 through December 31, 2001.

(Tr. 634-635) This analysis, of course, relates to the ever-difficult issue of the relation back of evidence that comes into existence after a claimant's insured status has expired. The ALJ necessarily had to address this issue in some depth because the claimant's attorney contended that the medical evidence from 2003 was relevant and related to the condition of Sanders' back prior to the expiration of his insured status such that claimant was disabled prior to his date last insured, that is, December 31, 2001.

Plaintiff's counsel takes issue with the ALJ's assertion "that there was an explanation to the claimant, by Dr. Peterson, about the correlation of correct

13

dermatomes in a prior discogram, which is not to be found in the records. The ALJ's conclusions about what this supposed conversation meant is certainly not supported by the record. The ALJ does not cite to any exhibit, for his rendition of the medical facts nor for support of his conclusions[.]" (Doc. 9, at 4) Counsel is correct that the ALJ did not cite to any exhibit in support of his rendition of the medical facts or his conclusions (*see* Tr. 634-635) but such exhibits do exist. First, a prior discogram was performed, or effected as Dr. Peterson would say (*see* Tr. 726 & 728), on October 23, 2001 by Dr. Todd Volkman (*see, e.g,* Tr. 584-585). Moreover, Dr. Peterson did discuss this prior discogram with Sanders during his office visit on January 8, 2003, as conceded by counsel (Doc. 9, at 4-5), in the following terms:

> Mr. Sanders is a gentleman seen at the request of Dr. Dyas for chronic lower back symptoms. The symptoms have been recalcitrant for many years, increasingly limiting in their nature of severity. He is questioning the efficacy of operative intervention. Historically he has shown lumber spondylosis by MRI examination. **Discogram was effected by Dr. Volkman last year with scattered findings of pain at the lower lumbar levels. No specific delineation of concordance was found on record review. No delineation was made surgically with the results of this examination.** We discussed in theory the basis of lumbar spondylosis and the predicate for low back pain causation. **We discussed lumbar discography and the delineation not of a purely  painful response but of a concordantly painful response.** We discussed the ability and the inability of lumbar arthrodesis across singular or multiple segments to control symptoms. The risks, benefits, and

imponderables of this discographic and ultimate surgical course
were discussed. He wishes to proceed  with evaluation. We'll
schedule him for an up-dated lumbar spine MRI initially. We'll
follow this with lumbar discography. He will follow in the office
as his MRI scan and lumbar discogram are concluded.

(Tr. 728 & 727 (emphasis supplied)) The highlighted portions of Sanders office visit with Dr. Peterson on January 8, 2003 are the most important because though the ALJ used different terms and language to explain these portions, this Court cannot find that the ALJ's translation of Peterson's notes was incorrect. In this regard, the Court notes that concordance is defined as "[a] state of agreement[.]" WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY, at 294 (1994). A review of plaintiff's October 2001 discogram by Dr. Peterson did not reveal concordance and Peterson clearly explained to Sanders that what was needed on a discogram, to warrant surgery, was a "concordantly painful response." (*See* Tr. 728 & 727)  It is implicit in Dr. Peterson's office notes that the reason surgery was not dictated or delineated[4] in October of 2001 was because there was lacking a concordantly painful response. (*Id*.) Accordingly, the Court finds that Dr. Peterson's office notes do, in fact, support the ALJ's statement that "the results of the [October 2001] discogram did not indicate that surgical intervention was indicated at the levels

---

[4]       Delineate means to "SKETCH[,]" "DEPICT[,]" or "PORTRAY[.]" WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY, at 359.

of the spine where the claimant complained he was experiencing pain." (Tr. 634) Accordingly, the Court finds that the ALJ did not substitute his hunch or intuition for the diagnoses or opinions of Dr. Peterson.

Even assuming that the ALJ erred in finding in this portion of his analysis of the 2003 evidence that the January 2003 MRI indicated that plaintiff's back condition had somewhat improved (*see* Tr. 634-635), a finding that appears erroneous to this Court, this fact does not promote plaintiff's argument because the real problem for plaintiff revolves around the two discograms and the state of the remaining medical evidence in existence prior to December 31, 2001. As aforesaid, the discogram in October of 2001, by Dr. Peterson's own interpretation, did not indicate the need for surgical intervention because of the lack of concordance, that is, the lack of agreement between plaintiff's pre-procedure description of his pain and the painful response elicited by the test. (*Compare* Tr. 728 & 727 *with* Tr. 584-585 & 750) However, the discogram in 2003 clearly revealed "a concordant response at L5-S1[,]" (Tr. 726; *see also* Tr. 750 ("The discogram at L5-S1 level was classically positive. The disc showed a grossly degenerative pattern and held 3 cc of contrast with a tight end point and no leak. There was a large posterior bulge present. There was a  classically positive provocative pain test with

injection of contrast re-producing the exact same back pain that the patient has been having all along.")) and, therefore, Dr. Peterson performed a bilateral disectomy at the L5-S1 level on February 4, 2003 (Tr. 744-745). That the medical findings did not indicate the need for plaintiff to undergo back surgery in October of 2001, but indicated the need for surgery in 2003, is very telling because it indicates that plaintiff's back impairment worsened.[5] Even more importantly, nothing about the October 2001 discogram undermines the ALJ's conclusion that plaintiff retained the residual functional capacity to perform those sedentary and light jobs identified by the vocational expert prior to the expiration of Sanders' insured status on December 31, 2001. In fact, this discogram evidence, along with the remaining medical evidence of record produced prior to the date last insured (*see* Tr. 435-467, 469-484, 493-514, 519-525, 561-586, 712-723, 729-730 & 763-768), substantially support the ALJ's RFC finding and conclusion of non-disability.[6]  Therefore, this Court is constrained to affirm the Commissioner's decision denying plaintiff

---

[5]     Dr. Peterson's office notes, as well, indicate that plaintiff's lower back symptoms were progressively becoming more "limiting in their nature of severity." (Tr. 728)

[6]     Because this Court sees no basis to relate the 2003 medical evidence back to the period prior to the expiration of Sanders' insured status, the ALJ did not err in failing to evaluate plaintiff's pain within the context of the 2003 evidence. The ALJ properly evaluated plaintiff's pain, as it existed prior to the expiration of his insured status, at length in his decision. (Tr. 630-634 & 640, Finding No. 9)

benefits.

## <u>CONCLUSION</u>

The Court **ORDERS** that the decision of the Commissioner of Social

Security  denying claimant benefits be affirmed.

**DONE** and **ORDERED** this the 26th day of January, 2006.

   s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**